No. 90-150

IN THE SUPREME COURT OF THE STATE OF MONTANA

1991


PEGGY A. YOUNG, Individually, and as
PERSONAL REPRESENTATIVE OF THE ESTATES
OF CRAIG CARROL YOUNG, Deceased, and
CHARLES E. YOUNG, Deceased,

        Plaintiffs and Appellants,

  -v-

MILTON DATSOPOULOS, RICHARD A. REEP,
WILLIAM K. VANCANAGAN and DATSOPOULOS,
MacDONALD & LIND,

        Defendants and Respondents.

**FILED**

AUG 21 1991

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA


APPEAL FROM:  District Court of the Fourth Judicial District,
In and for the County of Missoula,
The Honorable C.B. McNeil, Judge presiding.


COUNSEL OF RECORD:

      For Appellant:

          Richard F. Gallagher (argued); Margaret M. Joyce
Johnson; Church, Harris, Johnson & Williams; Great
Falls, Montana

      For Respondent:

          Dexter L. Delaney (argued); Mulroney, Delaney &
Scott, Missoula, Montana
Martin "Skip" Burke; Faegre & Benson; Minneapolis,
Minnesota


                  Heard:  February 20, 1991

              Decided:  August 21, 1991

Filed:

_____
            Clerk

Justice R. C. McDonough delivered the Opinion of the Court.

This is an appeal from the District Court of the Fourth Judicial District, Missoula County. Plaintiff appeals a partial summary judgment for defendants, which bars a large portion of her legal malpractice claims. We reverse and remand.

The following issue is dispositive of this appeal:

Do genuine issues of material fact exist as to when the statute of limitations began to run, making partial summary judgment inappropriate?

In December 1982, Craig Young, then thirty-one years of age, left his home in Missoula, Montana, on a business trip to Texas. Slightly over one month later, on January 12, 1983, his stabbed and gunshot body was found alongside a Texas roadway.

Between Craig's departure for Texas and the discovery that he had been murdered, his family became concerned about his uncharacteristic failure to communicate with them. His parents and his younger brother and sister went through his personal and business papers in an effort to locate clues as to his whereabouts. They knew Craig had had a business association with Jack Dickie, who lived in Texas. The exact nature of that business was not known to the family. They did know that Craig was involved in the development of mining claims, that Craig and Dickie may have been operating in "gray areas" of the law, and that Craig never appeared to have much money.

During the family's search through Craig's papers, they found newspaper clippings indicating that Dickie had been involved in

murders committed to collect the decedents' life insurance policies. The family learned that a life insurance policy which Craig had obtained the previous summer was in the amount of $3 million. They also found evidence of promissory notes worth $2.5 million from Craig to Vanguard World Holdings (Vanguard), a Panamanian corporation.

The family contacted the defendant law firm, knowing that the firm had done legal work for Craig. The law firm gave the family the name of a private investigator in Texas and also suggested that they contact the Texas Rangers. After Craig's body was found, the Youngs retained the defendant law firm to probate his estate.

In his will, Craig had named his father, Charles E. Young, and Jack Dickie as co-personal representatives of his estate. The Young family objected to any involvement of Dickie, who they strongly suspected was responsible for Craig's death. According to Peggy Young, defendants Reep and Vancanagan, attorneys with the defendant law firm, advised her and Charles E. Young that there was no basis for opposing Dickie's appointment as co-personal representative unless a criminal investigation connected him to Craig's death. Though Dickie remained as a co-personal representative, he agreed to forego fees for acting as such and he did not participate actively in the probate of the estate. The estate did pay Dickie's attorney fees incurred during the dispute over whether he should remain as co-personal representative.

United Pacific Insurance Company, which had issued the $3 million insurance policy on Craig's life, hired a private inves-

tigator who became convinced that Dickie had murdered Craig and that Dickie owned or controlled Vanguard. However, United Pacific eventually paid the face amount of the $3 million policy to the estate, and has never sought repayment. That life insurance policy was the only substantial asset of the estate.

The notes Craig had signed in favor of the Vanguard corporation had been issued in exchange for corporate stock and forty-nine Montana mining claims Craig had staked several years earlier. As part of a paper shuffle, Dickie and Craig had transferred these and other assets among several shell corporations, inflating their stated values with each transfer, until Craig's assets reached a paper value of over $10 million. This had been done to support the application for the insurance on Craig's life, which was a prerequisite to a $3 million loan Dickey ostensibly was arranging from a British labor union. Whether the Youngs understood all of this is disputed.

Peggy Young maintains that the members of the defendant law firm told the Youngs that absent evidence that Craig's signature had been forged, there was no basis for refusing to pay the $2.5 million promissory notes to Vanguard. The law firm contends that it advised the Youngs that a possible defense to the notes would be failure of consideration, but that because such a defense would challenge Craig's credibility in stating his net worth to the life insurance company to obtain the policy, the defense was not raised. Peggy Young maintains that no such advice was given.

On January 30, 1984, Charles E. Young, as co-personal representative of Craig's estate, agreed to settle the Vanguard claim for $2.14 million. The amount of the settlement was, in fact, suggested by Peggy Young. The remaining $1 million in insurance money went to the Youngs, as Craig's heirs. The estate inventory eventually listed Craig's mining claims as having no actual value at all. On the advice of defendants, the estate also abandoned certain legal claims defendants had been litigating on Craig's behalf against defendants Shuman, Munro, and Jenkins. Dickie was subsequently convicted in federal court on racketeering charges, which included matters relating to Craig's murder.

In October 1985, the Internal Revenue Service, in auditing Craig's estate's federal estate tax return, disallowed the deduction of the Vanguard claim from the estate assets due to failure of "adequate and full consideration, since it was merely a paper transaction." A $1.2 million deficiency was assessed against the estate. The Youngs contacted separate counsel for assistance with the IRS matter.

On September 3, 1987, the parties to this action executed an agreement to toll the running of the statute of limitations. Therefore, that is the effective filing date of the complaint, in which Peggy Young and Charles E. Young, as executor for the estate of Craig Young, were originally named as plaintiffs. In May of 1988, Charles E. Young died. His death further complicates the question of who knew what, and when. Peggy Young succeeded him as

5

personal representative of Craig's estate and as the plaintiff in this case.

The complaint alleges breach of contract, negligence, bad faith, negligent misrepresentation, and contractual bad faith. Peggy Young claims that the defendants committed legal malpractice by misadvising the Youngs or by failing to advise them properly concerning removal of Jack Dickie as a co-personal representative, the possible defense to the Vanguard claim of lack of consideration, and abandonment of the claims against Shuman, Munro, and Jenkins. She also asks for indemnity for the Youngs' attorney fees, costs, and expenses in defending against the IRS claim.

Defendants moved for summary judgment based on a statute of limitations defense; waiver, ratification and estoppel; and unclean hands, unjust enrichment, and in pari delicto. The District Court initially denied the motion. However, on the defendants' request for amendment of the order denying summary judgment, the court awarded defendants partial summary judgment on a theory that the statue of limitations for attorney malpractice had expired before the Youngs filed their complaint. The partial summary judgment dismissed all claims relating to the appointment and service of Jack Dickie as co-personal representative of Craig Young's estate, the settlement of the Vanguard claim against the estate, and the release of the legal claims Craig Young held against Shuman, Munro, and Jenkins. One claim survived the summary judgment: whether defendants were professionally negligent in failing to obtain an

6

advance letter ruling on the deductibility of the Vanguard claim on the federal estate tax return.

Do genuine issues of material fact exist as to when the statute of limitations began to run, making partial summary judgment inappropriate?

Summary judgment is proper only if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Rule 56(c), M.R.Civ.P. Our standard of review is the same as that employed by the district court. McCracken v. City of Chinook (1990), 242 Mont. 21, 24, 788 P.2d 892, 894. All reasonable inferences that may be drawn from the offered proof are to be drawn in favor of the party opposing the motion for summary judgment. Cereck v. Albertson's, Inc. (1981), 195 Mont. 409, 411, 637 P.2d 509, 511.

> Section 27-2-206, MCA, provides, in relevent part:
>
> An action against an attorney licensed to practice law in Montana . . . based upon the person's alleged professional negligent act or for error or omission in the person's practice must be commenced within 3 years after the plaintiff discovers or through the use of reasonable diligence should have discovered the act, error, or omission, whichever occurs last, but in no case may the action be commenced after 10 years from the date of the act, error, or omission.

While this statute incorporates the "discovery rule," this Court has held that the statute of limitations begins to run when the plaintiff has "knowledge of the facts essential to the cause of action, not knowledge of the legal theories upon which an action

7

may be brought." Burgett v. Flaherty (1983), 204 Mont. 169, 173, 663 P.2d 332, 334.

Defendants rely heavily upon Burgett and several other cases previously decided under § 27-2-206, MCA. In Burgett, the claim was based on the conflict between the attorney's action in stipulating to a dissolution of marriage by default and his client's wishes not to have a dissolution so entered. In Schweitzer v. Estate of Halko (1988), 231 Mont. 283, 751 P.2d 1064, the claim was based on the conflict between the client's new will and his old will, both of which the attorney had drafted, and both of which the client had signed. In Boles v. Simonton (1990), 242 Mont. 394, 791 P.2d 755, the malpractice claimed was omission of a savings clause in a default clause in a contract for deed. The contract was admittedly read before it was signed and this Court stated that "[t]he default clause, as here drafted, is not complex or beyond the understanding of a lay person." Boles, 791 P.2d at 758. The Court held that the statute of limitations began to run at the signing of the contract.

Here, in contrast to the above cases, the claim of legal malpractice is not based upon the attorney's acts contrary to the clients' wishes. Rather, the Youngs took legal positions on the basis of the defendants' expertise in legal matters. While one may assume, where an attorney has acted contrary to a client's wishes in a matter which is within the understanding of a lay person, that the client would be cognizant of the facts which form the basis for a claim of malpractice, the same cannot be said here.

8

In Schneider v. Leaphart (1987), 228 Mont. 483, 743 P.2d 613, this Court held that the statute of limitation for legal malpractice began to run not when the attorney drafted the defective agreement, of which the client was presumeably aware when he signed it, but two years later when the client was advised by an accountant that the agreement was flawed. As this Court stated in Boles, "the client became aware of the attorney's alleged negligence in including a maintenance provision in a property settlement when an accountant told him the provision was unnecessary; it was the discovery of this fact that triggered the statute. . .." Boles, 791 P.2d at 758.

In McMillan v. Landoe, Brown, et al., P.C. (1988), 233 Mont. 483, 760 P.2d 758, this Court held that § 27-2-206, MCA, commenced to run on a claim for malpractice in failing to exercise due care in prosecuting a sheriff's sale not from the date of the sheriff's sale, but when the client was forced to defend against an action based upon the sale. In Peschel v. Jones (1988), 232 Mont. 516, 760 P.2d 51, the statute began to run on a claim on a misdrafted agreement not when the agreement was drafted, but when other parties to the agreement took action which the client had believed would be prohibited under the agreement and when the client learned of claims against him which he had expected the agreement to resolve. These cases do not conform to the defendants' interpretation of § 27-2-206, MCA.

The Youngs maintain that they were not aware that different legal positions could have been taken in the matters for which they

9

claim attorney malpractice. They claim that, until they contacted separate counsel after receiving the IRS assessment in October 1985, they were not aware that defendants could have declined to represent Jack Dickie as a co-personal representatives of the estate, forcing Dickie to obtain separate counsel (who would normally receive part of the attorney fees for probating the estate). Further, they claim that until they contacted their present counsel they were not aware of the existence of a possible defense of lack of consideration for the Vanguard claim. They maintain that defendants told them that because Craig's signature on the Vanguard notes checked out as genuine, the notes would have to be paid out of Craig's estate. Finally, they claim that they were not informed that there was possibly remaining value in Craig's claims against Shuman, Munro, and Jenkins.

Because Dickie did not take an active role as co-personal representative of Craig's estate and did not accept any fee for so acting, it initially appears that the actual damages for that aspect are limited to the amount of the attorney fees Craig's estate agreed to pay for Dickie's temporary separate counsel. But other damages are also claimed under the various counts of the complaint. The claim is that defendants failed to advise the Youngs that co-personal representatives could be represented by separate counsel or that Dickie's appointment could be challenged as not in the best interest of the estate.

We have real doubts there was any value in Craig's claims against Shuman, Munro, and Jenkins. But, again, the Youngs are

claiming a failure to advise them properly on a matter not within the range of knowledge of the average lay person. That is a factual issue.

The substantive claim in this appeal appears to be the failure to pursue a defense of failure of consideration for the Vanguard claim. The Youngs were admittedly aware at the time Craig's body was found or shortly thereafter that their son may have operated in "gray areas" of the law; that he was not a wealthy man but that there was a $3 million policy of insurance on his life; that Jack Dickie was a prime suspect in Craig's murder; that Craig had executed $2.5 million in promissory notes payable to Vanguard; that Craig was afraid for his life. Mark Young, Craig's brother, knew that Dickie was associated with Vanguard and that Craig and Dickie had been engaging in stock shuffling on mining claims, for the purpose of increasing Craig's financial status. The Youngs also knew that Craig believed he would receive a large sum of money on his final fatal trip to Texas. Peggy Young admits that she was the one who suggested the amount of the eventual settlement with Vanguard and that she knew of the decisions made in probating Craig's estate.

We hold that material issues of fact are present as to when, as a result of all the other facts of which they were aware, the Youngs should have known or through the use of reasonable diligence should have known that defendants were omitting or failing to take certain actions, which omissions Peggy Young now claims constitute legal malpractice. The existence of the malpractice which is

11

claimed may be in effect inherently unknowable to the lay client. When it was or should have been knowable is exactly the type of factual question appropriate for resolution by a trier of fact.

Conflicts in the deposition testimony illuminate another aspect of the issues of material fact. In his deposition, defendant Reep states that before the estate made its settlement with Vanguard he advised the Youngs of the possible defense of lack of consideration. Peggy Young, in her deposition, states that no such advice was given. If the trier of fact believes the defendants, that claim is precluded, because prior to the January 1984 settlement the Youngs had actual knowledge that such a defense was available and that their attorneys were not going to raise it.

We hold that material issues of fact are present in this case as to the claims upon which the District Court granted summary judgment. We reverse the summary judgment and remand for further proceedings consistent with this Opinion. Because of our holding on that issue, it is not necessary that we consider the issue of whether defendants are estopped to assert the defense of the statute of limitations against their former clients.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____
Justices

_____
District Judge Johm M. McCarvel
sitting for Justice Karla M. Gray

_____
District Judge Thomas C. Honzel
sitting for Justice Terry N. Trieweiler

13

Justice Fred J. Weber dissents as follows:

The majority has stated the following issue as dispositive: Do genuine issues of material fact exist as to when the statute of limitations began to run, making partial summary judgment inappropriate? I agree with that statement of the issue. In considering that issue I conclude there are no issues of material fact in this case, only issues of legal theory.

Section 27-2-206, MCA, provides in substance that an action against an attorney must be commenced within three years after the plaintiff discovers or should have discovered the act, error or omission. The majority opinion cites a number of Montana decisions and reaches a conclusion that the cases do not conform to the defendants' interpretation of § 27-2-206, MCA. I disagree with that conclusion. The key legal statement of the pertinent Montana decisions is contained in Burgett v. Flaherty (1983), 204 Mont. 169, 173, 663 P.2d 332, 334. The majority opinion refers to Burgett but fails to conform to its holding. I think it appropriate to cite more fully to Burgett in which this Court stated as follows:

> As a matter of law, what is critical in determining when a legal malpractice action accrues is knowledge of the facts essential to the cause of action, not knowledge of the legal theories upon which an action may be brought.
> California's statute of limitations for legal malpractice is not identical to Section 27-2-206, MCA, but for the purpose of the discovery argument advanced by Burgett, its interpretation by the California Court of Appeals is persuasive.
> > "The question here is whether appellant's alleged ignorance of her supposed rights against her former attorney is sufficient to toll the statute of limitations.

14

> The statute of limitations is not tolled by belated discovery of <u>legal theories</u>, as distinguished from belated discovery of <u>facts.</u> In legal and medical malpractice cases, the courts are often confronted with such claims that the statute of limitations has been tolled. However, the Supreme Court repeatedly has explained that it is the knowledge of facts rather than discovery of legal theory, that is the test. The test is whether the plaintiff has information of circumstances sufficient to put a reasonable person on inquiry, or has the opportunity to obtain knowledge from sources open to his or her investigation. (Sanchez v. South Hoover Hospital, 18 Cal.3d 93, 101, 132 Cal.Rptr. 657, 553 P.2d 1129.) . . . " (Emphasis in original.) (Citations omitted.)

I emphasize that no Montana case has modified the <u>Burgett</u> holding as above stated. As a result I conclude that in Montana it is not knowledge of legal theories which is significant. The only test is whether the plaintiff had knowledge of facts essential to the cause of action. I will now review the plaintiffs' knowledge of facts essential to the plaintiffs' cause of action.

To shorten this dissent, I discuss only the primary claim on the part of the plaintiffs, that being the claimed failure to pursue a defense of failure of consideration for the Vanguard creditor's claim. I think it important to emphasize the extent of the factual knowledge on the part of the plaintiffs as set forth by the District Court in its careful review of the facts and of the law. Following are pertinent portions of the opinion of the District Court which has been reversed by the majority:

> Plaintiffs assert that Defendants advised that the Vanguard promissory notes would have to be paid because they had been signed by Craig Young, that there was no viable defense to the claim and that the law required

15

that the claim be paid. Plaintiffs further claim that Defendants did not tell them of a defense of insufficient or no consideration for the notes as a basis for denial of the creditor's claim. . . .

. . . A careful review of the facts found herein, and Plaintiffs' alternative motion for partial summary judgment for Defendants, now cause the Court to hold that all of the facts which constitute the acts, errors or omissions which are the basis of the alleged professional negligence relating to the settlement and payment of the Vanguard claim were discovered, or through the use of reasonable diligence should have been discovered by January, 1984.

In addition, no other facts relating to the settlement of the Vanguard creditor's claim have been discovered since January, 1984. All of the advice, misadvice or omission to advise Plaintiffs on that subject was concluded by Defendants by January 30, 1984.

Again Plaintiffs argue that the statute of limitations on this issue did not commence until their consultation with present counsel in October of 1985 when they "discovered" the alleged malpractice of Defendants. However, that is merely the date when the legal theory of Plaintiffs' suit was discovered and, as in the first claim set forth above, no additional facts have been, or will be, discovered since September 14, 1984 relating to the Vanguard creditor's claim settlement, and therefore Plaintiffs' complaint relating to such issue is likewise barred by the statute of limitations. (Emphasis added.)

The District Court concluded that there were no genuine issues of material fact, and therefore granted partial summary judgment to the defendants on the theory that each claim was barred by the statute of limitations, § 27-2-206, MCA.

The majority points to the contention by the plaintiffs that they were not aware of the different legal positions which could have been taken until after receiving the IRS assessment notice in October, 1985, and thereafter talking to their present counsel. The majority then concludes that material issues of fact are present as to when the Youngs should have known that defendants were failing to take certain actions which the plaintiffs now claim

16

constitute legal malpractice. I am unable to find any facts in the majority opinion which fit within that definition. The critical question is when the Youngs obtained knowledge of the essential facts, not when they obtained knowledge of their legal theories. As quoted in Burgett:

> In legal and medical malpractice cases, the courts are often confronted with such claims that the statute of limitations has been tolled. However, the Supreme Court repeatedly has explained that it is knowledge of facts rather than discovery of legal theory, that is the test.

Burgett, 663 P.2d at 332.

Plaintiffs' primary contention is that until they talked to another firm of attorneys, they did not know of the failure to advise them of the legal defense of lack of consideration. The plaintiffs' contention has been rejected under Burgett and succeeding Montana cases. As pointed out by the District Court, all of the facts which were known at the time of the 1990 order were known to the plaintiffs in 1984. There are no additional facts which subsequently became known to the plaintiffs. I conclude that the majority has disregarded Burgett and subsequent Montana cases interpreting § 27-2-206, MCA.

I would affirm the determination by the District Court that the claims were barred by the statute of limitations.

_____
Justice

Chief Justice J.A. Turnage joins in the foregoing dissent of Justice Fred J. Weber.

_____
Chief Justice